1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHON SEVERS, | 1:09-cv-01059-LJO-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| | [Doc. 1] |
| YATES, | |
| Respondent. | |

_____/

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## RELEVANT HISTORY

Following a jury trial in the California Superior Court for the County of Kings, Petitioner was convicted of forced rape in concert (Cal. Penal Code[1] §§ 264.1/261(a)(2); two counts of forced rape (§ 261(a)(2)); two counts of rape of an intoxicated person (§ 261(a)(3); oral copulation by force (§ 288a(c)(2); oral copulation of an intoxicated person (§ 261(a)(3); sodomy of an intoxicated person (§ 286(I); felony unauthorized recording (§ 632(a); and vehicle theft (Cal. Veh. Code § 10851).  Petitioner was also found to have served a prior prison term within the meaning of section 667.5(b).  (CT 136-142, 160-164, 166-174.)

On March 6, 2007, Petitioner was sentenced to an aggregate term of twenty years and four months in state prison.  (CT 575-576, 578, 583-584.)

_____

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1   Petitioner filed a timely notice of appeal.  On March 11, 2008, the California Court of

2   Appeal, Fifth Appellate District affirmed the judgment in all respects.  (Lodged Doc. No. 1.)

3   On June 11, 2008, the California Supreme Court denied review.

4   Petitioner filed the instant federal petition for writ of habeas corpus on June 16, 2009.

5   (Court Doc. 1.)  Respondent filed a timely answer to the petition November 25, 2009.  Petitioner

6   did not file a traverse.  (Court Doc. 17.)

7   <u>STATEMENT OF FACTS</u>[2]

8   On July 6, 2006, Lindsay and her friend, Virginia, resided in a house at the
    Lemoore Naval Station. Lindsay and her husband, a member of the military, were
9   separated and in the process of obtaining a dissolution.

10  On the morning of July 6, Lindsay took an anti-depressant called Lexapro.
    Lindsay and Virginia planned to celebrate the latter's birthday that evening by
11  going to dinner and then visiting some local bars. At 7:00 p.m., Lindsay, Virginia,
    and the latter's friend, Michael, went to Applebee's Restaurant in Hanford.
12  Virginia's boyfriend, Jonathan, was deployed on a ship in San Diego, and he
    allowed Virginia and Lindsay to use his pickup truck for transportation during his
13  absence. The trio met two of Virginia's sisters and several friends at the restaurant.
    The group shared a large margarita and ate some appetizers. Lindsay said she did
14  not feel the effects of the alcohol at the time she left Applebee's.

15  After finishing at Applebee's, Lindsay, Virginia, and Michael went to the
    Secrets bar in Hanford, where they drank and socialized. Lindsay consumed two or
16  three strong drinks. Lindsay went outside the bar to smoke a cigarette and
    encountered appellant and codefendant Asher, who were walking down the street.
17  They asked Lindsay to recommend a bar in the area. She recommended the Bastille
    Bar and said she would be there later in the evening. However, she did not
18  exchange names or telephone numbers with the two men.

19  After spending 30 to 45 minutes at Secrets, Lindsay, Virginia, and Michael
    went to the Bastille Bar to hear a live band. Lindsay testified she was feeling a
20  "little drunk" at this point. Lindsay assumed she and her friends arrived at 8:30 or
    9:00 p.m., stayed at the Bastille Bar for several hours, and continued drinking.
21  Virginia thought they stayed until between midnight and 1:20 a.m. Michael
    thought they left at 11:30 p.m.

22
    During their time at the Bastille, Lindsay saw and socialized with appellant
23  and Asher. Lindsay said she was "drunk" at this point. Lindsay said appellant was
    flirtatious at the Bastille and kissed her at one point. She admitted flirting back
24  with appellant. At trial, Virginia recalled seeing Lindsay flirt with appellant at the
    Bastille but said the flirting was not sexual. However, Virginia told Dennis Reed,
25  an investigator with the Kings County District Attorney's Office, that Lindsay and
    appellant touched each other a lot when they talked. At one point in the evening,
26  appellant picked up Lindsay and twirled her around. She responded by wrapping

27  _____

28  [2] The Court finds the Court of Appeal correctly summarized the facts in its March 11, 2008 opinion.
    Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

2

her legs around appellant's waist. At trial, Virginia said she did not hear any sexual discussions between Lindsay and appellant at the Bastille. However, Virginia told Investigator Reed that Lindsay laughed along when appellant made some sexual jokes. Michael said he saw Lindsay talking with appellant at the Bastille but did not see any flirting.

The group decided to go home when Virginia became intoxicated. Lindsay asked whether she could invite appellant and codefendant back to their home for more drinking and talking and Virginia agreed. Lindsay stopped drinking about 30 minutes before the group left the Bastille. She obtained a cellular telephone number for the defendants and someone put the number into Virginia's cell phone. The group left the Bastille at about 1:20 a.m. Lindsay testified that she acted as the designated driver that evening and stated: "We were all pretty drunk." Virginia and Michael said she was not intoxicated and drove well on the way home from the Bastille.

Lindsay, Virginia, and Michael drove to a gas station in the pickup truck and appellant and codefendant purchased some beer and followed them in a separate vehicle. Appellant and codefendant parked their vehicle in a guest parking area at the Naval Air Station because they did not have a permit to park on the base. Appellant and codefendant then got into Moser's truck and they all entered the base together. Once they arrived at the residence of Lindsay and Virginia, Lindsay placed the truck keys in her purse and set the purse on the kitchen counter.

Lindsay and the others began to drink beer and Lindsay thought she consumed five or six beers. After about an hour of visiting, Virginia and Michael went to Virginia's bedroom to go to sleep. Virginia did not see the two guests again until appellant entered her bedroom to ask to borrow her cell phone.[FN4] Michael remembered appellant entering the bedroom twice that night. On the first occasion, appellant offered Michael a beer but Michael declined. On the second occasion, appellant asked to borrow Virginia's cell phone because he could not get a signal on his own cell phone. Michael remembered appellant saying that Lindsay had given appellant and codefendant permission to sleep on the couch.

FN4. At some point in the evening, Virginia went to get some water and heard loud music playing on the television in the living room. Virginia turned off the television since Lindsay was not in the room. Virginia said Lindsay usually turned off the television if she was not watching it. Virginia also noticed that Lindsay had closed her bedroom door, something she never did. Virginia said appellant entered her bedroom about 10 to 15 minutes after she turned off the television set. He asked to borrow her cell phone so he could call his boss. Appellant told Virginia that Lindsay had said it was okay for them to sleep on the couch and offered to take them to their truck so they could get to work at 6:00 a.m. Appellant said he needed to call his boss but his phone was not working and that is why he asked to borrow Virginia's. According to Virginia, he took her cell phone out of the room, returned the instrument about five minutes later, and thanked Virginia. Shortly after appellant returned Virginia's phone, she heard the sound of a departing vehicle.

Lindsay, appellant, and codefendant remained in the living room and began to watch a movie on the television. Lindsay felt drunk and left the room briefly. When she returned, appellant asked her to finish her beer and Lindsay complied. About 10 minutes later, Lindsay's condition deteriorated and she began to feel heavy. Appellant began kissing Lindsay on her neck and mouth. Lindsay kissed appellant back at first. When codefendant also began to kiss Lindsay on the neck,

she became uncomfortable and pulled away. Lindsay said she began to feel heavier and heavier and felt like she could not move. Appellant and codefendant pulled her shirt up and kissed her breasts. Lindsay said she was confused and could not understand what was happening to her.

Appellant and codefendant eventually stood Lindsay up and took her to her bedroom. Lindsay felt incapable of speaking. The two men removed her clothing, lay on the bed with her, and kissed her neck, breasts, and face. The two men told her she was sexy and good looking and undressed down to their boxer shorts. Lindsay said she was unbalanced, confused, and felt unable to talk or move. She also said she could not talk or hold her head up.

Appellant began to have genital intercourse with Lindsay. Lindsay was lying underneath appellant on her stomach. At trial, she had difficulty remembering details of the sexual offenses and the order in which they occurred. Lindsay said appellant and codefendant both made her orally copulate them. Each man grabbed her head and pushed it toward his penis. Lindsay resisted by pulling her head back and closing her mouth. She said she never did suck on their penises. According to Lindsay, the men kept saying, " 'Open your mouth, baby, open your mouth.' " During the sexual assault, appellant had sex with Lindsay when she was on her back. At one point, appellant turned to codefendant and said it was his turn. Codefendant then had sexual intercourse with Lindsay.

During the events in her bedroom, Lindsay saw appellant hold up his cell phone and point it at Lindsay and himself. She thought appellant was using the phone to take pictures of the various sexual acts. Lindsay said she never permitted the men to photograph or videotape her. Lindsay eventually told the men she did not want to have sex with them. The men responded by telling her that she did want to have sex with them. Although Lindsay disagreed and tried to get up, the men would lay her back down on the bed. At some point, appellant was having sex with Lindsay while she lay on her stomach. Appellant pulled his penis out of her and reinserted it into her rectum. Lindsay said she felt pain when this occurred but was unable to speak. She also said appellant's penis remained in her rectum for about five seconds before he reinserted it into her vagina. At trial, Lindsay thought the rectal penetration could have been an accident. She previously told District Attorney Investigator Reed, "'He just missed and sort of entered the wrong hole.' "

Codefendant left the bedroom and returned with some condoms. Lindsay said they resembled the condoms she carried in her purse. Appellant and codefendant put on the condoms, had sexual intercourse with her, and made her orally copulate them. Lindsay recalled the men orally copulating her two times apiece and having sexual intercourse with her two times each. The men eventually dressed, left the bedroom, and had a conversation that she could not understand. Appellant returned alone and again had sexual intercourse with Lindsay. During the entire encounter, Lindsay felt very heavy and unable to move. After the last act of intercourse, appellant entered the bedroom between two and four times to check on Lindsay. Lindsay said she was just starting to feel like she could move again when appellant reentered the bedroom alone. Lindsay tried to get up and get dressed. Appellant asked her, " 'What are you doing?' " Appellant wrapped Lindsay in a comforter, laid her down on the bed, and told her, " 'It's okay. It's okay. Just go to sleep.' " During this same time, appellant told Lindsay she agreed to have sex with them. She responded by saying she did not agree to it.

A few minutes after appellant left the bedroom for the last time, Lindsay heard the tires of a vehicle squealing in her driveway. Lindsay had never told the two men they could take the truck keys out of her purse and Virginia never gave

4

the men permission to borrow the truck. Lindsay got up, dressed herself, entered Virginia's bedroom, and said they needed to call 911 because the men had stolen the truck and raped her. Lindsay called 911 and reported that two men had just raped her and taken their truck. Lindsay estimated an hour elapsed between the time they entered the bedroom and the time the two men left the house.

Alan Bohannon, a 911 dispatcher at the Naval Air Station, received the emergency call from Lindsay at 2:38 a.m. on July 7, 2006. He transferred the call to Fresno County authorities but remained on the phone line. The prosecution played the recording of the 911 call for the jury.

Brian Alexander, a Navy military police officer, received a call about a stolen vehicle at about 2:40 a.m. on July 7, 2006. Upon receiving the call, the base shut down to incoming and outgoing traffic. Alexander stopped appellant and codefendant at the gate and confiscated their cell phones. The military police took the two men into custody. John Gillett, another Navy military police officer, responded to Lindsay's residence at about 2:38 a.m. When Gillett arrived, he found Lindsay curled up in a fetal position. She was crying and shaking. Lindsay told Gillett she had been raped and their truck had been taken. She also explained she was intoxicated and did not realize what was happening at first. Lindsay showed Gillett a picture of appellant on her MySpace page and said, " 'It was this guy right here.' "

Alison Caldwell, an investigator with Naval Criminal Investigative Services (NCIS), processed the crime scene. Caldwell also met with appellant and codefendant at the NCIS office on the base, photographed codefendant, and took custody of appellant and codefendant's cell phones. Caldwell found recorded images of Lindsay and appellant on one of the cell phones. Caldwell was not certain which phone was taken from which person. Caldwell turned over the cell phones to District Attorney Investigator Reed on July 13, 2006. On July 14, Reed gave the phones to Kings County Computer Forensic Analyst Marlene Dunn for technical examination.

Marlene Dunn accessed both phones on July 17, 2006 and looked for recorded photographic evidence. Dunn made a compact disc (CD) of 14 photographic images that she downloaded from one of the cell phones. Dunn was also able to access three video clips from that same phone .[FN5] That cell phone also contained a number under the heading "Girls" and that number was reflected on the "recent dialed" and "received calls" lists of the phone. Dunn could not determine whether this cell phone dialed Virginia's phone number or was dialed by it. The prosecution presented no evidence of any image or video files in the other cell phone.

FN5. The prosecution played the video clips during trial. During the clips, a man repeatedly urged Lindsay to put "it" in her mouth and said it will be over after she is done. He said, "It'll be over after you're done. No. Stop. You want it to be done right?" "Put it in your mouth real quick and it'll be all over."

Sexual Assault Examiner Patti Driscoll examined Lindsay at 6:05 a .m. on July 7, 2006. Driscoll found disrupted tissue in Lindsay's vaginal area and a reddened area around her cervical opening. Driscoll said the condition of Lindsay's tissue was consistent with sexual assault because tissue disruption is less likely when intercourse is consensual and the participants are aroused. Driscoll noted that Lindsay's rectal area was very tender and said she was unable to examine the interior portion because of Lindsay's pain. In Driscoll's opinion, Lindsay was

tender as a result of the reported anal penetration. Driscoll took a blood sample from Lindsay at 7:55 a.m. on July 7.

In August 2006, codefendant sent Lindsay a letter and pleaded with her to "tell the truth" and say the events of July 6 and 7 were "consensual." Codefendant included a picture of his daughter and a sonogram of his unborn son with the letter and Lindsay was upset by the correspondence.

On August 24, 2006, District Attorney Investigator Reed interviewed Lindsay and Virginia. Lindsay told Reed she was having a difficult time remembering and that details came to her over time. Lindsay told Reed she took some Lexapro [FN6] and "probably" had something to drink before going out on the evening of July 6. She also said she shared a daiquiri at the restaurant. Lindsay also said she had two drinks at the first bar, one or two light beers at the Bastille, and more than three beers once the group returned home. She also told Reed the group stopped at Taco Bell before going back to the base. Lindsay described appellant's penetration of her anus by saying, " 'He just missed and sort of entered the wrong hole.' "

FN6. Bill Posey, a toxicologist with Central Valley Toxicology in Clovis, California, testified that Lexapro is an antidepressant that "has a potential of having an additive central nervous depressant effects when mixed with alcohol." In Posey's view, Lexapro taken with alcohol has the potential for increasing the effect of alcohol on an individual. However he noted "most of the studies have indicated that the additive effect is not a profound one. There are warnings against using the drug with alcohol."

Bill Posey, a toxicologist with Central Valley Toxicology, testified he received Lindsay's blood sample from NCIS on August 28, 2006. That sample had been drawn by Nurse Driscoll. Posey tested the blood sample from the sexual assault evidence collection kit. He did not detect any drugs or alcohol in the sample. In addition to conducting a standard drug and alcohol screen, Posey looked for chemicals that have a sedative effect when combined with alcohol. Posey said one such substance, gamma-hydroxybutyrate (GHB), can extend the effects of alcohol but typically leaves the blood stream in six hours, depending upon the dosage. Responding to a hypothetical question, Posey said a person who had several drinks between 7:00 p.m. and 1:00 a.m. and then consumed five or six light beers over the next hour would experience a rapid onset of sedation if the last beer contained GHB. He said such a person would feel sluggish or even totally comatose. Posey further testified that GHB metabolizes quickly so that every 13 minutes the individual would feel half of the effects of the drug. Such a person would be expected to come out of the state of sedation very quickly.

On October 30, 2006, Lindsay viewed the photographic CD and three video clips at the District Attorney's office. Lindsay explained that the image of people on a bed depicted appellant and her in her room. Lindsay also said the three video clips showed the sexual acts that appellant and codefendant committed and included her moaning sounds. The prosecution played the video clips for the jury. The first clip depicted appellant putting his penis in Lindsay's mouth. The second clip depicted Lindsay and appellant's penis. Lindsay left the courtroom in tears when the prosecution played the third video clip.

The parties stipulated that appellant was convicted of four counts of statutory rape (§ 261.5, subd. (c)) in Solano County on April 16, 2002.

*Defense*

NCIS Special Agent Irene Howard testified she met with Lindsay on the morning of July 7, 2006, and escorted her to her medical examination. She also interviewed Lindsay. Lindsay told Howard she had five or six beers before going to the restaurant on July 6. Lindsay also said that appellant " 'began grabbing' " on her and kissing her once they were back at her place on the base. Lindsay told Howard she " 'didn't have any problem with that.' " Lindsay also told Howard she took a Lexapro pill at about 5:00 p.m. on July 6.

With respect to appellant's anal penetration, Lindsay told Howard, "[h]e just missed and sort of entered the wrong hole.' " Lindsay further told Howard that she screamed during the sexual encounter and ran to her roommate's bedroom following the encounter. Lindsay said appellant was the individual who picked her up and carried her to the bedroom. She said codefendant just watched them. Lindsay told Howard she wanted to scream but it seemed like there was no sound coming out of her mouth. Lindsay said she screamed when appellant's penis penetrated her anus and appellant told her, " 'It's all right, baby, just hold still.' "

Officer Gillett said he spoke to Lindsay about the MySpace page featuring appellant's picture. Lindsay said she and appellant visited their respective MySpace pages that evening and appellant asked her to add him to her "friends" list.

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam).  "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to

1    determine whether the state court [was objectively unreasonable] in its application of controlling

2    federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).  "[A]lthough we

3    independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle v.</u>

4    <u>Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

5    C.     <u>Ineffective Assistance of Trial Counsel</u>

6        Petitioner contends that trial counsel failed to show him the video clips depicting sexual

7    acts recovered from one of the confiscated telephones, failed to explain to him the difference

8    between consecutive and concurrent sentencing, and failed to explain the maximum exposure

9    before trial.  (Petition, at 5, Points and Authorities, at 4-18.)

10       1.     <u>Factual Background</u>

11        Petitioner challenged defense counsel's performance by way of a handwritten letter to the

12    trial court on December 15, 2006, requesting a new trial.  Petitioner complained that he had not

13    been shown the videos presented by the prosecution, and he was not informed of the maximum

14    exposure he was facing if convicted.  (CT 291-293.)

15        On January 5, 2007, the trial court excused Marianne Gilbert as Petitioner's counsel and

16    appointed Brian Grupton to investigate whether there was any basis to move for a new trial.  (CT

17    327-333.)

18        On January 19, 2007, Mr. Grupton informed the trial court that he believed there were

19    viable grounds to move for a new trial based upon ineffective assistance of counsel.  (RT 1401-

20    1404; CT 552.)

21        Petitioner thereafter filed a motion for new trial on January 29, 2007. (CT 554-564.)

22    Petitioner raised several grounds of ineffective assistance by trial counsel, Marianne Gilbert.  He

23    claimed he was not informed of the maximum sentence he was facing, counsel failed to show him

24    the video clips taken from his cellular telephone, and counsel was not very concerned about the

25    sexual offenses because she believed a defense of consent was viable.  Petitioner contends that

26    counsel's erroneous advice/performance lead him to reject the plea bargain of nine years in prison.

27    Petitioner stated his decision rejecting the plea offer would "quite probably" have been different

28    had he been properly advised.  (CT 559-560, 563.)

1    The State filed an opposition to Petitioner's motion on February 16, 2007.  (CT 565-570.)

2    The trial court heard the motion on March 2, 2007.  (RT 1501-1613; CT 571-573.)  In

3    addition to submitting his declaration, Petitioner testified at the hearing.  (RT 1502-1503; CT 561-

4    563.)  Petitioner stated that Mrs. Gilbert informed him that the plea deal was for one count of

5    forcible rape with a five, seven, or nine year sentence, and she advised him not to take it because

6    he had a "really good" case."  (RT 1504.)  The Friday before the beginning of the trial on Monday,

7    Petitioner claims he informed Gilbert that he was not ready to proceed to trial.  (Id.)  He advised

8    counsel that the toxicology report demonstrated that the victim was sober at the time of the

9    incident and supported the finding that she was lying.  (RT 1505.)  He claims counsel told him that

10   the video showed he did not rape the victim and there was nothing to worry about.  (Id.)  He told

11   counsel that he still wanted to view the video and she informed him she would do so that day. (Id.)

12   Petitioner claims he made several requests to view the video prior to trial and the first time he

13   viewed it was during trial.  (Id.)  Petitioner further claims that he was never advised the maximum

14   exposure after the deletion of the kidnapping charge that carried a life sentence.  (RT 1506.)  Prior

15   to trial, Petitioner was apparently under the belief that the maximum sentence was nine years with

16   all other counts to run concurrent-based on his experience from a prior criminal case.  (RT 1506,

17   1511.)

18        On cross-examination, Petitioner acknowledged that at the trial confirmation hearing on the

19   Friday before trial, Judge Schultz asked him if there was any reason why the trial should not

20   commence the following Monday, and Petitioner said "No, we are ready."  (RT 1507-1508.)

21   During the various pre-trial hearing, Petitioner acknowledged that he never informed the court that

22   he desired to view the videos before the trial commenced.  (RT 1509.)  Petitioner knew that the

23   kidnapping offense charged in the initial Information carried a life sentence.  (RT 1510.)  Petitioner

24   stated that Gilbert advised him that his maximum exposure was 18 years and 8 months.  (RT

25   1512.)  Mr. Woodbury-who represented Petitioner prior to Ms. Gilbert-informed him of a deal for

26   eleven years and four months.  (RT 1511.)

27        Petitioner had several telephone conversations with his mother during his detention at the

28   jail.  During a conversation on November 2, 2006-just one day prior to the jury returning its

10

verdict, Petitioner discussed the video clips with his mother, and he believed the video clips did not support the prosecution's theory of the case. (RT 1513-1514.) Petitioner asked his mother several questions about the video clip, including if the video showed him raping the victim, whether it showed them forcefully receiving oral copulation, whether it showed them sodomizing her, and whether it showed her doing anything against her will, and his mother responded "no" to all questions. (RT 1519-1520.) Petitioner's mother opined that the video did not support any of the charges Petitioner faced. (RT 1521.) Petitioner later told his mother that he believed "the video was going to be way worse than [what it was]." (RT 1521-1522.) Petitioner acknowledged that he never told Mrs. Gilbert that he was shocked by what he saw in the videos, or expressed a desire to accept a plea deal. (RT 1522-1523, 1574.) Petitioner stated that he "probably" would not have gone to trial had he seen the videos. (RT 15527.) After viewing the videos, Petitioner believed that his attorney wanted him to be convicted. However, just prior to the jury returning its verdict, Petitioner told his mother that Mrs. Gilbert was working very hard for him. (RT 1527-1529.)

Michael Woodbury represented Petitioner during the initial proceedings. (RT 1530-1531.) Woodbury believed that he advised Petitioner of the prison consequences of the charges outlined in the complaint, as it was his customary standard to do so in all cases. Woodbury explained the initial kidnapping charge and that it carried a life with the possibility of parole sentence. (RT 1533-1533-1538, 1542, 1548-1549.) Woodbury believed that he also discussed the penal consequences for all other counts charged in the Complaint, which is substantiated by his notations thereon. (RT 1540-1541, 1548-1549.) As was his customary practice, Woodbury also believed that he advised Petitioner that his sentence could be both fully consecutive and consecutive one-third of the mid-term sentences. (RT 1541-1542.)

During his representation, Woodbury advised Petitioner of the prosecution's plea deal for eleven years and four months. (RT 1544.) It was Woodbury's practice when conveying plea offers, to fully discuss the evidence that would be presented to the jury-as he believed he did in this case. (RT 1545,1549.) Woodbury recalled that Petitioner was very adamant about being innocent. Woodbury believed that Petitioner's position was that it was consensual and he should

1   therefore not have to serve any prison time.  (RT 1546-1547.)

2        At the time of the hearing, Marianne Gilbert, had been a criminal defense attorney for 19

3   years and was appointed to represent Petitioner at his arraignment on September 5, 2006.  (RT

4   1557.)  At that hearing, Petitioner told Gilbert that he would pled guilty only to the vehicle theft

5   charge and would not admit any sex offense.  (RT 1558.)  Prior to trial, Gilbert met with Petitioner

6   on several different occasions to discuss the case.  She recalled meeting with Petitioner at the jail

7   for about thirty to forty-five minutes, and had discussions with him before and after the various

8   pre-trial hearings.  She also recalled four or five telephone conversations with Petitioner's mother.

9   (RT 1558-1560.)  Gilbert confirmed providing all discovery to Petitioner including a copy of the

10  transcripts from the video clips.  (RT 1560-1561.)  She also provided Petitioner's mother with an

11  actual copy of the video clips and she believed his mother was able to view the video clips.  (RT

12  1562-1563.)  Gilbert approximated that she spent more than one hundred hours preparing for

13  Petitioner's trial that lasted an entire week.  (RT 1562.)

14       Gilbert received a copy of the Amended Information-which deleted the kidnapping charge

15  on October 25, 2006.  (RT 1565.)  Gilbert viewed the video clips at the District Attorney's office

16  and discussed the contents of them with the prosecutor. (RT 1565-1566.)  Gilbert discussed the

17  video clips in detail with Petitioner on several different occasions, including the prosecution's

18  interpretation and the strengths and weaknesses.  (RT 1568, 1570, 1591-1592.)  She expressed her

19  opinion that the jury would most likely find the video offensive as it included a close-up shot of a

20  woman's crotch, commentary by him, and it depicted two men having sexual with one woman.

21  (RT 1569.)  Gilbert was not able to show Petitioner the video clips because she could not play

22  them on her laptop computer.  (RT 1570-1571, 1589-1590.)  Gilbert stated that Petitioner never

23  informed her that he was not ready to proceed to trial, or that the videos did not show anything.

24  (RT 1572-1574.)  Gilbert sought throughout the trial to have the video clips excluded and they

25  were a focal point for the defense.  (RT 1573-1574.)  Petitioner was adamant that the encounter

26  was consensual and he would not plead guilty to any sex crime.  (RT 1575, 1597.)

27       Gilbert discussed potential sentence exposure and informed him that he faced a life term on

28  the original kidnapping charge, and she informed him of the maximum potential term for each

count.  (RT 1576-1579.)  Gilbert conveyed the prosecution's offer to plead to a sex crime with a

three, six or eight year triad.  However, Petitioner stated he was "not taking any sex crime."  (RT

1580.)  Petitioner countered that he would plead to the vehicle theft.  (Id.)  Gilbert advised

Petitioner that he should consider the offer, and she never told him to reject the offer because he

had a really good defense.  (RT 1583, 1589.)  Gilbert never calculated a total maximum term for

the determinate terms because Petitioner was not interested in pleading to a sex crime, and she

never told him that the maximum exposure was 18 years and 8 months.  She did ask Petitioner if

he wanted to go over the exposure calculations, but he did not want to because he was not willing

to plead guilty to a sex crime.  (RT 1588, 1597.)

Gilbert received the amended information-deleting the kidnapping charge on October 25,

2006 and believed she gave a copy to Petitioner.  (RT 1565-1566.)  Petitioner never advised

Gilbert that he wished to change his plea after the filing of the amended information.  (RT 1581.)

The parties later agreed that count one should be an enhancement to count two, and Petitioner

again did not express a desire to change his plea.  (RT 1580.)  While the jury was deliberating,

Gilbert spoke with Petitioner about the maximum exposure, and when he asked if he was facing

eighteen years, she said yes and told him "more than that."  (RT 1581-1582, 1594.)

Probation Officer, Dan Luttrell, testified that he interviewed Petitioner subsequent to the

trial on November 20, 2006.  Petitioner was twenty-five years old at the time and told Luttrell he

hoped to get out of prison by the time he was in his forties.  (RT 1599-1600.)

The trial court denied Petitioner's motion for new trial.  The court made the specific factual

finding that both Gilbert and Woodbury were highly credible witnesses and Petitioner was not

particularly credible.  (RT 1611.)  After articulating the applicable legal standard under California

law, the trial court noted that a situation in which a client informs counsel that he has no desire to

hear the maximum exposure because he is not guilty is difficult.  However, the court found it was

"probably ineffective assistance of counsel to fail to do so."  (RT 1612.)  Nonetheless, the trial

court found no resulting prejudice as it was "clearly established that he would not have responded

any differently to the plea agreement offered by the People even if the Court were able to accept

such a plea agreement."  (RT 1613.)  This was particularly so because Petitioner clearly conveyed

13

1  that he would not plead guilty to anything other than the vehicle theft.  (Id.)  The motion was

2  denied.  Petitioner thereafter requested that Mrs. Gilbert represent him at his sentencing hearing.

3  (RT 1614-1615.)

4        2.    Last Reasoned State Court Decision

5        In the last reasoned state court decision, the Fifth Appellate District denied the claim

6  stating as follows:

7        Ineffective representation that results in a defendant's decision to proceed to
         trial can give rise to a claim of ineffective assistance of counsel.  However, a
8        defense attorney's simple misjudgment as to the strength of the prosecution's case,
         the chances of acquittal, or the sentence the defendant is likely to receive upon
9        conviction will not-without more-give rise to a claim of ineffective assistance.  In
         determining whether a defendant, with effective acceptance, would have accepted a
10       plea offer, pertinent factors include: (1) whether counsel actually and accurately
         communicated the offer to the defendant; (2) the advice, if any, given by counsel;
11       (3) the disparity between the terms of the proposed bargain and the probable
         consequences of proceeding to trial, as viewed at the time of the offer; and (4)
12       whether the defendant indicated he or she was amenable to negotiating a plea
         bargain.  (Alvernaz, supra, 2 Cal.4th at pp.934, 937-938.)
13
14       In this context, a defendant's self-serving statement-after trial and
         conviction-that with competent advise he or she would have accepted a proffered
15       plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof
         as to prejudice.  Such a statement must be corroborated independently by objective
16       evidence.  In addition to proving that he or she would have accepted the bargain, a
         defendant must establish the probability that it would have been approved by the
17       trial court.  Such a requirement is indispensable to a showing of prejudice because
         judicial approval is an essential condition precedent to any plea bargain negotiated
18       by the prosecution and defense.  A plea bargain is ineffective unless and until it is
         approved by the court  (Alvernaz, supra, 2 Cal.4th at pp. 938, 940-941.)

19       A reviewing court need not determine whether counsel's performance was
         deficient before examining the prejudice suffered by the defendant as a result of the
20       alleged deficiencies.  If it is easier to dispose of an ineffectiveness claim on the
         ground of lack of prejudice, that course should be followed.  (Alvernaz, supra, 2
21       Cal.4th at p. 945.)  Here, we initially note that [Petitioner] has failed to establish the
         probability that a plea bargain would have been approved by the trial court.  (Id. at
22       pp. 940-941.)  Assuming arguendo [Petitioner] established or could have
         established such a probability, we must closely scrutinize whether [Petitioner]
23       established a reasonable probability that, with effective representation, he or she
         would have accepted the proffered plea bargain.  (Id. at p. 938.)
24
25       The prosecution made two plea offers to [Petitioner], the first conveyed to
         him by attorney Woodbury and the second conveyed to him by attorney Gilbert.
26       Woodbury believed he discussed the penal consequences of all of the counts with
         [Petitioner] as well as the potential for fully consecutive sentences.  Woodbury said
27       he explained to [Petitioner] that the charge of kidnapping-alleged in the original
         information-carried a life term with the possibility of parole.  Woodbury said the
28       prosecution's offer was for a maximum term of 11 years 4 months.  However,
         [Petitioner] was adamant about his innocence and maintained the sexual intercourse

                                              14

1    was consensual.

2          Gilbert said she and [Petitioner] discussed the fact that a life term was the
     maximum prison exposure based upon the kidnapping charge in the original
3    information.  Gilbert said she wrote the potential terms on a copy of the criminal
     complaint and informed [Petitioner] about the maximum potential term for each
4    count.  Gilbert said the prosecution's offer was for a maximum term of eight years.
     At the time of the offer, [Petitioner] indicated he did not want to take the deal and
5    Gilbert never calculated a total potential maximum term for the offenses carrying
     determinate terms.[3]  Gilbert recalled that [Petitioner] was not interested in a plea
6    agreement that entailed a sex offense.  [Petitioner] made a counteroffer, expressing a
     willingness to plead guilty to a vehicular offense.  At one point Gilbert told
7    [Petitioner] it was risky not to take the prosecution's offer because he would face
     more than eight years in prison if he lost at trial.  Gilbert said she asked [Petitioner]
8    if he wanted her to review the prison exposure calculations with him but
     [Petitioner] said he did not want to do so because he was not going to plead guilty
9    to a sex crime.

10         [Petitioner's] maximum exposure was later reduced by the filing of the
     amended information, which deleted the kidnapping charge.  Nevertheless, at the
11   time the plea offers were conveyed and rejected, [Petitioner] was facing a life term
     and declined to accept prosecution offers of determinate terms.  Moreover, Gilbert
12   timely provided [Petitioner] with transcripts of the three video clips and advised
     [Petitioner] that a close-up shot of a woman's crotch, recorded commentary by
13   [Petitioner], and the depiction of two men having intercourse with one woman
     would likely be offensive to the jury.  Despite these facts and circumstances,
14   [Petitioner] refused to consider a plea offer beyond the crime of vehicle theft.  In
     view of this situation, [Petitioner] cannot show that he would have taken the eight-
15   year offer had he been given different advice or had he screened the video clips in
     advance of trial. [Petitioner] failed to demonstrate prejudice and the trial court
16   properly denied his motion for new trial.

17   (Lodged Doc. No. 1., Opinion, at 22-25.)

18        3.     Analysis of Merits

19        The law governing ineffective assistance of counsel claims is clearly established for the

20   purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151

21   F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

22   assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

23   668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

24   the petitioner must show that counsel's performance was deficient, requiring a showing that

25   counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

26

27        [3] Gilbert received the second settlement offer on September 28, 2006.  The amended information that
     deleted the kidnapping charge was not delivered to Gilbert until October 25, 2006.  Therefore, [Petitioner] had
28   accurate information about his maximum exposure at the time he rejected the prosecution's second plea offer.

1    the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

2    representation fell below an objective standard of reasonableness, and must identify counsel's

3    alleged acts or omissions that were not the result of reasonable professional judgment considering

4    the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir.

5    1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong

6    presumption that counsel's conduct falls within the wide range of reasonable professional

7    assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21

8    F.3d 1446, 1456 (9th Cir.1994).

9         Second, the petitioner must show that counsel's errors were so egregious as to deprive

10   defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

11   also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

12   ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

13   1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was

14   unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there

15   is a reasonable probability that, but for counsel's unprofessional errors, the result would have been

16   different.

17        A court need not determine whether counsel's performance was deficient before examining

18   the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.

19   668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency

20   that does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are

21   analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).

22   Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

23        This two-part standard also applies to challenges to guilty pleas based in ineffective

24   assistance of counsel.  See Turner v. Calderon, 281 F.3d 851, 879 (9th Cir. 2002) (citing Hill v.

25   Lockhart, 474 U.S. 52, 57-58 (1985).  In the context of a guilty plea, a petitioner must show that

26   (1) his counsel failed to provide reasonable competent advice, and that (2) there is a reasonable

27   probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted

28   on going to trial.  Hill v. Lockhart, 474 U.S. at 58-59.

1    The Ninth Circuit has held that the holding and rationale of <u>Hill</u> applies equally to the

2  opposite situation when, as here, a defendant claims counsel's inept advice lead to the rejection of

3  a plea offer.  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1052 (9th Cir. 2003).  Deficient performance can be

4  shown if the advice was so incorrect and so insufficient that it undermined the defendant's ability

5  to make an intelligent decision about whether to accept the plea offer.  <u>Turner v. Calderon</u>, 281

6  F.3d at 881.  To meet this prong, it must be demonstrated that there was "gross error on the part

7  of counsel."  <u>Id</u>. at 880.  To demonstrate prejudice, defendant must show that he would have

8  accepted the plea deal given proper advice.  <u>Nunes v. Muller</u>, 350 F.3d at 1054; <u>Turner v.</u>

9  <u>Calderon</u>, 281 F.3d at 879.

10    Under California law-which the state court applied in this instance-"a defendant's self-

11  serving statement-after trial, conviction, and sentence-that with competent advice he or she would

12  have accepted a proffered plea bargain, is insufficient in and of itself to sustain the defendant's

13  burden of proof as to prejudice, and must be corroborated independently by objective evidence.  A

14  contrary holding would lead to an unchecked flow of easily fabricated claims."  <u>In re Alvernaz</u>, 2

15  Cal.4th 924 (1992).  In <u>Perez v. Rosario</u>, 459 F.3d 943, 947 n. 2 (9th Cir. 2006), the Ninth Circuit

16  recognized the uncertainly within the Circuit as to whether "the state court's holding that

17  uncorroborated, after-the-fact avowals are legally insufficient to establish that a petition would

18  have accepted a plea bargain" was objectively reasonable.  In <u>Turner v. Calderon</u>, the Ninth Circuit

19  found that the petitioner's "self-serving" statement was insufficient, in itself, to demonstrate

20  prejudice.  281 F.3d at 881.  However, in <u>Nunes</u>, the Ninth Circuit expressed doubt of whether

21  corroboration was required.  <u>Nunes v. Mueller</u>, 350 F.3d at 1055 n. 6 (opining without deciding

22  that the Alvernaz corroboration requirement was in tension with Strickland's discouragement of

23  mechanical rules).  The Court need not resolve this ambiguity because there was no resulting

24  prejudice in this case.

25                    a.    Advise of Maximum Sentence Exposure

26    In addressing Petitioner's claim, the Court of Appeal initially pointed out that the relevant

27  time frame is the factual circumstances that existed at the time the plea offer was represented to

28  and rejected by Petitioner.  This factual finding is presumed correct under § 2254(e)(1), and

17

1    Petitioner has the burden of rebutting the presumption by clear and convincing evidence.

2    Stevenson v. Lewis, 384 F.3d 1069, 1072 (9th Cir. 2004). Petitioner has not met his burden. The

3    record shows that Petitioner consistently indicated that he would not plead guilty to a sex crime

4    and therefore wished to proceed to trial. Thus, even if it is assumed counsel was ineffective for

5    failing to inform Petitioner of the maximum exposure if convicted on all counts, the fact remains

6    that Petitioner cannot demonstrate prejudice. It is undisputed that Petitioner continuously

7    expressed that he would not plead guilty to a sex crime, and there is no objective evidence that his

8    decision would have changed had counsel advised him of the maximum exposure after the

9    kidnapping charge was withdrawn. Furthermore, it is implausible that Petitioner would have

10   accepted the plea bargain given that he faced a life sentence at the time the plea offers were

11   rejected, but would have later accepted after the life offense was withdrawn and he faced a less

12   severe sentence. While it appears that Petitioner may have accepted the plea offer had he known

13   the result of the trial, a reasonable probability did not exist at the time of the offer that he would

14   accepted either plea deal in lieu of going to trial for an offense he believed he did not commit.

15   Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable

16   application of Strickland. 28 U.S.C. § 2254(d)(1).

17                        b.      Failure to View Video Clips

18           Although counsel admitted that she did not show Petitioner the video clips prior to his

19   rejection of the plea agreements, counsel's conduct was not gross misadvise as to the strength and

20   weaknesses of his case. Counsel recalled discussing the content of the video clips in detail with

21   Petitioner prior to trial, and she provided Petitioner with a copy of the transcripts of the video

22   clips. (RT 1560-1561.) Counsel also provided Petitioner's mother who was able to view them.

23   Gilbert viewed the video clips with the District Attorney and found them to be offensive. She

24   expressed her feelings with Petitioner and warned him that the jury would also likely find the video

25   clips offensive. More specifically, Gilbert warned Petitioner that the close-up shots of a woman's

26   crotch, the commentary by him, and the fact the videos depicted two men having sex with one

27   woman would likely be offensive to the jury. (RT 1569.) Petitioner never told Gilbert that he was

28   not ready to proceed to trial without viewing the videos, nor did she tell him that the videos did

not depict anything.  Moreover, Petitioner acknowledged recording the videos and it was undisputed that he did so.  The claim now that had he viewed the videos prior to trial, he would have "probably" taken the plea deal is belied by the record.  Considering these circumstances, the trial court properly found that Petitioner's claim to the contrary was incredible, and the state courts' determination of this issue was not contrary to, or an unreasonable application of Strickland.  28 U.S.C. § 2254(d)(1).

D.   Admission of Prior Sex Crimes

Petitioner contends that his procedural and substantive due process rights were violated by admission of evidence of his prior sex crimes to prove his predisposition to commit the current sex crimes.

1.   Factual Background

The prosecution sought to introduce evidence of Petitioner's four prior statutory rape convictions under California Evidence Code section 1108.  (RT 18.)  Petitioner's counsel opposed arguing they were inflammatory and prejudicial.  (RT 20.)  The trial court did not immediately rule on the matter.  (RT 20-21.)

On November 1, 2006, after reviewing the applicable California law, the trial court ruled the evidence would be admissible.  (RT 797.)   The trial court reasoned as follows:

> The Court's considered the factors described in Evidence Code Section 352 with regard to the issue.  The prior convictions that are offered have some probative value as tending to show that [Petitioner] has a character to engage in sexual conduct without regard to the legality of the conduct or the legal ability of the victim to legally consent to the act, so there's some probative value.
>
> The proffered evidence appears to consist of documents showing the convictions.  It does not appear to involve any undue consumption of time, nor any undue tendency to confuse issues.
>
> The nature of the violation of Section 261.5 is less serious than most of the charged sexual crimes in this case, and there appears to be no danger of the evidence creating any undue prejudice.
>
> Accordingly, the Court finds the probative value of the proffered evidence outweighs any tendency to confuse the issues, to involve undue consumption of time, or to provide undue prejudice, and the proffered evidence is admissible.
>
> However, evidence of the defendant's unsatisfactory performance on probation or of the sentence pronounced is excluded, as it seems to have no probative value for the proffered purpose and has some potential prejudice.

1   (RT 797-798.)

2       2.   <u>Last Reasoned State Court Decision</u>

3       In finding Petitioner's claim to be without merit, the California Court of Appeal, held the

4   following:

5           As a general rule, evidence of a defendant's prior conduct is inadmissible
        when offered by the opposing party to prove the defendant's conduct on a specific
6       occasion, unless it involves the commission of a crime, civil wrong, or other act and
        is relevant to prove some fact (e.g., motive, intent, plan, identity) other than a
7       disposition to commit such an act. (Evid. Code, § 1101, subds. (a), (b); *People v.
        Falsetta* (1999) 21 Cal.4th 903, 911.) In 1995 the Legislature enacted Evidence
8       Code section 1108 (Stats. 1995, ch. 439, § 2), which expanded the admissibility of
        disposition or propensity evidence in sex offense cases. (*Falsetta, supra,* at p.911.)
9       Section 1108, subdivision (a), provides:

10          "In a criminal action in which the defendant is accused of a sexual offense,
        evidence of the defendant's commission of another sexual offense or offenses is not
11      made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to
        Section 352."

12
        Evidence Code section 1108 was intended, in the case of sex crimes, to
13      sweep away the narrow categories of admissibility of other crimes evidence that had
        existed under Evidence Code section 1101. (*People v. Britt* (2002) 104
14      Cal.App.4th 500, 505.) Instead, such evidence is admissible, unless otherwise
        excluded by Evidence Code section 352, whenever it may be helpful to the jury, on
15      a common sense basis, for resolution of any issue in the case, including the
        probability or improbability that the defendant has been falsely accused. (*See
16      People v. Britt,* supra, at p. 506.)

17          A trial court retains the discretion to admit or exclude evidence under
        Evidence Code section 352. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) A trial
18      court's exercise of its discretion under Evidence Code section 352 is reviewed for
        abuse of discretion and will not be disturbed on appeal absent a showing that the
19      trial court exercised its discretion in an arbitrary, capricious or patently absurd
        manner. (*People v. Rodriguez, supra,* at pp. 9-10.)

20
        In *People v. Harris* (1998) 60 Cal.App.4th 727, the court set out five
21      factors for evaluating the admissibility of prior offense evidence. These included:
        the inflammatory nature of the evidence, the probability of confusion, the
22      remoteness in time of the prior incidents, the consumption of time involved, and the
        probative value of the prior offense evidence. (*Id.* at pp. 737-741.)

23
        In the instant case, these factors weighed in favor of admission of the
24      evidence. As to the inflammatory nature of the evidence, the stipulation setting
        forth [Petitioner]'s uncharged acts was no stronger and far less inflammatory than
25      the testimony concerning the charged offenses. As to the probability of confusion,
        the record reflects a clear demarcation between evidence relating to the charged
26      offenses involving Lindsay in Kings County and the stipulation as to the uncharged
        offenses involving the underage females in Solano County. Moreover, as
27      respondent points out, the stipulation was very straightforward and left no chance
        for confusion. With respect to remoteness, [Petitioner] was placed on probation on
28      the prior crimes on July 30, 2002, and that probation was revoked on March 8,

1   2005.  He was paroled on August 8, 2005, and was not free from custody for a year
2   when he committed the instant offenses.  As to consumption of time, the stipulation
    was set forth in less than two pages of reporter's transcript.  The total transcript of
3   the trial was in excess of 1,000 pages.  The prior evidence consumed very little
    time.

4           Finally, the proffered evidence was relevant to show that [Petitioner] would
5   engage in sexual conduct without regard to the legality of that conduct or the legal
    ability of the victim to consent.  The evidence tended logically and by reasonable
6   inference to prove the intent upon which it was offered and was not merely
    cumulative.  (*See People v. Harris*, *supra*, 60 Cal.App.4th at pp. 739-740.)

7           [Petitioner] lastly argues that admission of evidence of the four prior
8   convictions of "unlawful intercourse with teenage girls" violated his right to due
    process.  The California Supreme Court has upheld the constitutional validity of
9   Evidence Code section 1108 against a due process challenge in *People v. Falsetta*,
    *supra*, 21 Cal.4th at pages 907-908, 912-922.  This court is bound by that
10  precedent and [Petitioner]'s claim must be rejected. (*Auto Equity Sales, Inc. v.
    Superior Court* (1962) 57 Cal.2d 450, 455.)

11  (Lodged Doc. No. 1, Opinion, at 27-30.)

12          3.      Analysis of Merits

13      Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

14  federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083,

15  1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for

16  the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a

17  denial of due process. Estelle v. McGuire, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104

18  S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5

19  F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v.

20  Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of

21  evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due

22  process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there

23  are no permissible inferences that the jury may draw from the evidence can its admission rise to the

24  level of a due process violation.  Id. at 920.

25      California Evidence Code section 1108 is akin to Federal Rule of Evidence 414.  In

26  addition, California Evidence Code section 352 is the state equivalent of Federal Rules of Evidence

27  402 and 403.  See Mejia v. Garcia, 543 F.3d 1036, 1047 n. 5 (9th Cir. 2008).  In United States v.

28  LeMay, 260 F.3d 1018 (9th Cir. 2001), the Ninth Circuit rejected the argument that the traditional

                                            21

1    ban on the admission of propensity evidence qualifies as a "fundamental" principle of justice, as it

2    pertains to sex offenses, when the court rejected a due process challenge to Federal Rules of

3    Evidence 414.  The Ninth Circuit concluded that Rule 414 did not violate due process because

4    Rule 403 (the federal equivalent to California Evidence Code section 352) acts as a filter that

5    results in the exclusion of evidence that is so prejudicial as to constitute a due process violation.

6         The Supreme Court has expressly declined to determine whether a state law that permits

7    admission of prior crimes to prove propensity to commit the current offense violates the Due

8    Process Clause.  Estelle v. McGuire, 502 U.S. at 75, n. 5 ("[W]e express no opinion on whether a

9    state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to

10   show propensity to commit a charged crime.").  If there no Supreme Court authority on point then

11   it simply "cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal

12   law.'" Carey v. Musladin, 549 U.S. 70, 77 (2006); see Wright v. Van Patten, 552 U.S. 120, 126

13   (per curiam).

14        Because the propensity evidence was properly admitted under California law to prove

15   Petitioner's intent, and lacking any clearly established Supreme Court authority prohibiting

16   admission of such evidence,[4] it cannot be said that the state court of appeal opinion was "contrary

17   to, or involved an unreasonable application of, clearly established Federal law, as determined by

18   the Supreme Court of the United States" nor was it based on "an unreasonable determination of

19   the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),

20   (2).

21   E.   Instructional Error

22        Petitioner contends the trial court should have instructed the jury that the circumstantial

23   evidence of predisposition must be proven beyond a reasonable doubt.

24        1.   Last Reasoned State Court Decision

25   The California Court of Appeal denied the claim stating the following:

26   The trial court instructed the jury in CALCRIM No. 1191 as follows:

27   _____

28        [4] Although Petitioner cites several cases in his points and authorities, none set forth clearly established
     law prohibiting such propensity evidence and all are pre-AEDPA cases.

"The People presented evidence that Defendant Severs committed crimes of unlawful sexual intercourse with a minor, a violation of Penal Code Section 261.5, that were not charged in this case.  This crime was defined for you during trial.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense.

"Proof by a preponderance of the evidence is a different burden of proof [from] beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it's more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard the evidence entirely.  If you decide that the Defendant Severs committed the other sexual offenses, you may consider that evidence and weigh it together with all of the other evidence received during the trial to help you determine whether he committed the sex offenses charged in this case.

On appeal, [Petitioner] contends evidence of uncharged offenses is used as circumstantial evidence of guilt and it is thus error and a violation of due process to instruct jurors that this form of circumstantial evidence is subject to the lesser preponderance standard of proof.  In *People v. Reliford* (2003) 29 Cal.4th 1007, 1009 (*Reliford*), the Supreme Court held the 1999 version of former CALJIC No. 2.50.01 correctly stated the law.  That instruction, as given in the trial of that case, provided:

"'Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense other than that charged in the case.

"'"Sexual offense: means a crime under the laws of a state or of the United States that involves any of the following:

"'Contact, without consent, between the genitals or anus of the defendant and any part of another person's body.

"'If you find that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type of sexual offenses.  If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.

"'However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.  The weight and significance of the evidence, if any, are for you to decide.

"'You must not consider this evidence for any other purpose.'" (*Reliford*, *supra*, 29 Cal4th at pp. 1011-1012.)

The Supreme Court held it was not reasonably likely that a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof.  The court noted that nothing in the instructions authorized the jury to use the preponderance of the evidence standard for anything other than the preliminary determination whether the defendant committed a prior

sexual offense in 1991 involving S.B., the victim in the *Reliford* case.  The instructions explained that, in all other respects, the People had the burden of proving the defendant guilty beyond a reasonable doubt.  (*Reliford*, *supra*, 29 Cal.4th at p. 1016.)

The Supreme Court also gave tacit approval to the 2002 revision of former CALJIC No. 2.50.01, stating:

" ... The 2002 revision ... deletes the sentence, 'The weight and significance of the evidence, if any, are for you to decide' and inserts an additional cautionary statement: 'If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.' ... [W]e think the new sentence is an improvement.  It provides additional guidance on the permissible use of the other-acts evidence and reminds the jury of the standard of proof for a conviction of the charged offenses."  (*Reliford*, *supra*, 29 Cal.4th at p. 1016.)

Respondent properly notes that CALCRIM No. 1191 is even more restrictive than its CALJIC predecessors because it expressly advises the jury "that evidence of another sexual offense is not sufficient alone to find the defendant guilty of any sexual crime in this case.  The People must still prove each element of each offense beyond a reasonable doubt."  Under the doctrine of stare decisis, the decisions of the Supreme Court are binding upon and must be followed by all the state courts of California. (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.) [Petitioner]'s contention must be rejected under the authority of *Reliford*.

(Lodged Doc. No. 1, Opinion, at 30-32.)

2.    Analysis of Merits

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970).  This is because the prosecution has the burden of proving every element beyond a reasonable doubt. Carella v. California, 491 U.S. 263, 265, 109 S.Ct. 2419, 2420 (1989) (*citing* In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970)).  The United States Supreme Court has held that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury."  Victor v. Nebraska, 511 U.S. 1, 5, 114 S.Ct. 1239 (1994).  The instruction "must be considered in the context of the instructions as a whole and the trial record."  Estelle, 502 U.S. at 67, *citing* Cupp v. Naughton, 414 U.S. 141, 147

24

(1973).  The court must then determine if there was a reasonable likelihood that the jury applied

the instruction at issue in an unconstitutional manner.  Estelle v. McGuire, 501 U.S. at 72.

Although the circumstantial evidence instruction allowed the jury to draw an inference that

Petitioner committed the charged crimes, such evidence is admissible under California law and

there is no clearly established federal law to the contrary.  The instruction explicitly stated that the

prior uncharged offenses "is not sufficient by itself to prove that the defendant is guilty of the

offenses charged here," and the State was still required to "prove each element of the crime

beyond a reasonable doubt."  This language made clear to the jury that the preponderance standard

of proof applied only to the prior offenses, and the current crimes must be proven beyond a

reasonable doubt.  Furthermore, the jury was instructed to consider all the instructions as a whole

(CALCRIM No. 200), and in rendering a finding of guilt beyond a reasonable doubt, all evidence

must be considered (CALCRIM No. 220).  The jury is presumed to have followed these

instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Accordingly, under these

circumstances, the state courts' determination of this issue was not contrary to, or an unreasonable

application of, clearly established Supreme Court precedent.

F.      Insufficient Evidence to Support Sodomy Conviction

Petitioner claims there was insufficient evidence to support his conviction for sodomy.

1.      Last Reasoned State Court Decision

In finding sufficient evidence supported Petitioner's sodomy conviction, the California

Court of Appeal stated:

> In determining a claim of insufficiency of evidence, a reviewing court must
> ascertain whether, after viewing the evidence in the light most favorable to the
> prosecution, any rationale trier of fact could have found the essential elements of
> the crime beyond a reasonable doubt.  The appellate court presumes in support of
> the judgment the existence of every fact the trier could reasonably deduce from the
> evidence.
>
> Although it is the jury's duty to acquit a defendant if it finds the
> circumstantial evidence susceptible of two reasonable interpretations, one of which
> suggests guilt and the other innocence, it is the jury, not the appellate court, which
> must be convinced of the defendant's guilt beyond a reasonable doubt.  Simply put,
> if the circumstances reasonably justify the jury's findings, the judgment may not be
> reversed simply because the circumstances might also reasonably be reconciled with
> a contrary finding.  (*People v. Farnam* (2002) 28 Cal.4th 107, 142-143.)

Section 286, subdivision (a) defines sodomy as the "contact between the penis of one person and the anus of another person.  Any sexual penetration, however slight, is sufficient to complete the crime of sodomy."  Sodomy is a general intent crime that requires the intent to do the act that causes the harm. (*People v. Davis* (1995) 10 Cal.4th 463, 518, fn. 15.)  In the instant case, [Petitioner] pulled his penis out of Lindsay's vagina and reinserted his penis into her rectum.  Lindsay said it hurt when this occurred but she was unable to speak. Lindsay said [Petitioner]'s penis remained in her rectum for about five seconds before he reinserted his sexual organ into her vagina.  At the time [Petitioner] penetrated Lindsay's rectum, he told her, "It's all right, baby, just hold still." Lindsay's rectum was so sore following the assault, that she was unable to permit Nurse Driscoll to examine the interior of her rectum.

Although Lindsay made statements that [Petitioner] "missed" and "entered the wrong hole," the jury could have reasonably concluded that the duration of the penetration, [Petitioner]'s comments during the penetration, and the condition of her rectum following the penetration all combined to establish guilt of sodomy beyond reasonable doubt.  The judgment of conviction was supported by substantial evidence and reversal is not required.

(Lodged Doc. No. 1, Opinion, at 32-33.) (footnote omitted).

2.      Analysis of Merits

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.  In a habeas corpus proceeding, a petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1278-1279 (9th Cir. 2005).  In addition, when a federal court reviews the factual record "that supports conflicting inferences [it] must presume- -even if it does not affirmatively appear in the record- -that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.

This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v.

1   Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply

2   to state court determinations of legal questions or mixed questions of law and fact, the facts as

3   found by the state court underlying those determinations are entitled to the presumption.  Sumner

4   v. Mata, 455 U.S. 539, 597 (1981).

5         After viewing the evidence in the light most favorable to the prosecution, and resolving any

6   conflicting inferences in favor of the prosecution, the Court finds that a rational factfinder could

7   have found Petitioner guilty beyond a reasonable doubt of sodomy, and the state courts'

8   determination of this issue was not contrary to, or an unreasonable application of, clearly

9   established Supreme Court precedent.  Under California law, sodomy is a general intent crime

10  which only requires the defendant intend to do the act which causes harm.  People v. Davis, 10

11  Cal.4th 463, 518, fn. 15 (1995).  Lindsay testified that during intercourse, he intentionally pulled

12  his penis out of her vaginal area and put it into her rectum.  She felt pain when this happened, but

13  she was unable to speak.  Petitioner's penis remained in her rectum for approximately five second

14  before he reinserted it into her vagina.  (RT 333-334, 412.)  Because of the trauma to Lindsay's

15  rectum, the nurse was unable to examine the interior of her rectum.  (RT 814-816.)  Viewed in the

16  light most favorable to the prosecution, sufficient evidence supports Petitioner's sodomy

17  conviction.

18        Petitioner claims that Lindsay described the penetration to the rectum as accidental.  (RT

19  412, 672, 977.)  However, Lindsay's testimony was clear that Petitioner pulled his penis out of her

20  vagina and placed it into her rectum.  When asked whether Lindsay told an investigator that he

21  "just missed and sort of entered the wrong hole," she clearly stated it may have been just her

22  opinion and she had no idea of his intentions.  (RT 412.)  Thus, Lindsay's testimony on this point

23  was nothing more than pure speculation.[5]

24        Furthermore, the fact that the penetration of Lindsay's rectum was for five seconds is of no

25  relevance.  Penetration however slight is sufficient to support a conviction for sodomy under

26  California law.  Cal. Penal Code § 286(a).  Lindsay stated that she screamed when he penetrated

27

28        _____

          [5] Indeed, the trial court sustained the prosecution's objection as speculation.  (RT 412.)

her anus and Petitioner stated, "It's all right, baby, just hold still." (RT 980.)  The fact that the penetration lasted five seconds which resulted in Lindsay's rectum being severely traumatized, supports the finding that he penetrated her intentionally, and removed it only because of her severe discomfort.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and,

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    January 23, 2010**                              **/s/ Dennis L. Beck**
                                                        UNITED STATES MAGISTRATE JUDGE